**Kenneth Andrew FRIEDMAN, Petitioner,**

v.

**James M. GAMBLE, Administrator, Montana State Prison, Respondent.**

**CV 85–94–M–CCL.**

United States District Court,
D. Montana,
Missoula Division.

Sept. 18, 1995.

Michael Donahoe, Federal Defenders of Montana—Helena Branch, Helena, MT, for Kenneth Andrew Friedman.

Robert F.W. Smith, Office of the Montana Attorney General, Helena, MT, for Rick Day, Montana State Prison.

## OPINION AND ORDER

LOVELL, District Judge.

This cause is before the court on the findings and recommendation of the United States Magistrate Judge, who recommends that the petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, be dismissed. Petitioner objects to the Magistrate Judge's findings and recommendation. The court reviews such objections *de novo.* 28 U.S.C. § 636(b)(1).

On September 17, 1980, Petitioner Kenneth Friedman was charged in the Fourth Judicial District of the State of Montana, Missoula County, with three counts of sexual intercourse without consent, one count of felony assault, and three counts of felony theft. (Information, Docket # 163, App. 1.) The state charged that the Petitioner had raped or assaulted four women on May 9, June 28, June 30, and July 9, 1980. Petitioner faced the possibility of approximately 200 years of imprisonment if convicted on all original counts.

On April 6, 1981, at Petitioner's change of plea hearing, Petitioner acknowledged having raped two women at knifepoint and also having stolen money from the two women. Petitioner also acknowledged using a knife to assault a third woman. Petitioner pleaded guilty to Count II, sexual intercourse without consent, Count III, sexual intercourse without consent, and Count IV, aggravated assault. The prosecutor moved to dismiss Count I and to reduce the robbery counts, Counts V, VI, and VII, to misdemeanor theft. Petitioner then pleaded guilty to Counts V, VI, and VII. (Transcript of Change of Plea Hearing, April 6, 1981.)

The Magistrate Judge held two evidentiary hearings, during which Petitioner was represented by counsel, to address the facts pertaining to the following issues: (1) whether Friedman's guilty plea was coerced by actions of defense counsel; (2) whether Friedman was afforded effective assistance of counsel; and (3) whether the plea bargain agreement was breached. Particularly, the Magistrate Judge inquired:

(1) Did counsel refuse to prepare a defense unless Friedman pled guilty?

(2) Was there ample evidence upon which counsel could have raised a defense?

(3) Did counsel ignore an exculpatory witness?

(4) Was counsel ineffective by failing to object to the lineup?

(5) Did counsel represent to Friedman he would serve a maximum of 20 years if he pled guilty?

(6) Did counsel fail to mention certain consequences of the guilty plea, i.e., the possibility of concurrent/consecutive sentences or a dangerous designation?

(7) What were the terms of the plea bargain agreement?

(8) Did Friedman receive a greater sentence than bargained for?

After receiving the evidence submitted by the parties on these questions, the Magistrate Judge found that Petitioner was represented by two experienced criminal defense lawyers who spent in excess of 100 hours in preparation for trial. The defense lawyers retained an investigator who spent more than 80 hours investigating the case. The investigator contacted and interviewed each of Petitioner's six alibi witnesses, and found that none could provide an alibi for the Petitioner at the times and dates in question. Friedman could not support his claim that his counsels' lack of diligence in investigating his case limited his available defenses. Specifically, Friedman presented no evidence at either evidentiary hearing that showed that defense counsel ignored any exculpatory witness or failed to investigate any defense. Friedman failed to show that his counsel coerced him into pleading guilty by refusing to formulate a defense. Friedman's counsel made a strategic decision not to challenge a lineup, during which one of the victims did and one did not identify Friedman as the perpetrator, but to use the lineup at trial as part of a mis-identification defense.

The reasons Friedman's defense attorneys decided to enter into plea negotiations are as follows: (1) Friedman had no alibi defense; (2) mis-identification was the only remaining defense but would have required Friedman to testify; (3) Friedman was not a credible witness; (4) Friedman made admissions to police officers upon his arrest which could have been used against him at trial; (5) the complaining witnesses were prepared to testify against Friedman; and (6) Friedman faced more than 100 years of imprisonment if convicted. The court also notes that Friedman made admissions to defense counsel both during and after being hypnotized by a defense psychologist who was consulted by defense counsel to determine whether Friedman had a psychiatric defense available to him. (Tr.Vol. I at 17–18.)

Friedman actively participated in the plea negotiations and was apprised of various terms of the plea agreement proposed during negotiations. The Magistrate Judge identified the terms of the plea agreement as follows:

(1) the State would dismiss Count I, sexual intercourse without consent, and would reduce the felony theft charges to misdemeanors; (2) the State would recommend no more than 40 years of imprisonment plus a dangerous designation for parole eligibility purposes; and (3) the State would not oppose any recommendation for treatment, which would require that Friedman be transferred to an out-of-state facility because no sexual offender treatment program was available in Montana at that time.

(Tr.Vol. I at 12–14, 151; Tr.Vol. II at 37; McLean Dep. at 4–5; Pet.Ex. B (admitted at hearing of November 19, 1993); Tr.Vol. II at 36.) Friedman understood the terms of the plea bargain agreement, including the fact he could be sentenced to a maximum sentence of 40 years, that consecutive sentences could be imposed up to an aggregate of 40 years, and that he could be given the dangerous offender designation. (Tr.Vol. I at 14, 64, 68, 148, 149; McLean Dep. at 10.) Defense counsel did not represent to Friedman that the maximum possible sentence was 20 years. (Tr. Vol. I at 64–65, 131.) Defense counsel informed Friedman of the rights he would waive by pleading guilty, the status of any defenses, and the likelihood of success at trial. (Tr.Vol. I at 40–41, 63, 110–11, 150; Tr. of Plea Hearing, April 6, 1981, at 3.) In the face of this evidence, Petitioner fails to

present any evidence showing his plea was coerced by defense counsel.

The prosecutor held to the plea bargain by recommending a sentence of 20 to 40 years in Montana State Prison with a dangerous designation. (Sentencing Transcript, February 1, 1982, at 24.) The presentence report prepared by the parole and probation officer recommended a minimum term of imprisonment of "not less than 20 years," but provided no maximum recommendation. (Presentence Investigation Report at 7, Docket # 163, App. 3.) Friedman was sentenced to 40 years of imprisonment and designated as a dangerous offender for parole eligibility purposes. (Sentence & Judgment, Docket # 163, App. 4; Tr.Vol. I at 66–68, 133–36, 151; Tr.Vol. II at 44.) The Magistrate Judge found that the sentence actually imposed fell within the parameters of the prosecutor's recommendation, the parole and probation officer's recommendation, and Petitioner's plea bargain agreement with the State of Montana.

The court notes that on August 11, 1982, Friedman's sentence was reduced by the Sentence Review Division of the Montana Supreme Court to 20 years imprisonment and 20 years suspended to permit Friedman to enter a sexual offender treatment program in Florida that would not accept a participant having a sentence of more than 20 years. (Order of Sentence Review Division, Docket # 163, App. 5.)

Friedman argued that his counsel should have objected to the court's consideration of a 1975 Ohio conviction for rape and aggravated burglary. However, the Magistrate Judge found that the prosecutor had considered using the 1975 Ohio conviction only to request a persistent felony offender status (and decided against it), but had not used the 1975 Ohio conviction as a basis for the dangerous offender designation, which was based on the nature of the crimes committed in Montana. (Sent. Tr. at 24–25; McLean Dep. at 10.) Furthermore, the dangerous offender designation was a non-negotiable position that the State had insisted upon during plea negotiations. (Tr.Vol. I at 14, 64, 148; McLean Dep. at 10.)

After considering at length the requirements that guilty pleas must be voluntary and intelligent, that a criminal defendant be given effective assistance of counsel, and that the plea agreement must be honored, the Magistrate Judge found that Friedman had presented no evidence showing that his guilty pleas were not voluntary and intelligent, that he was denied effective assistance of counsel, or that his plea bargain was breached.

Petitioner objects to the Magistrate Judge's Findings and Recommendations as follows:

**Objection # 1: Defense counsel Michael Sherwood rendered ineffective assistance of counsel by failing to challenge the constitutionality of a 1975 Ohio conviction which may have affected Petitioner's designation as a dangerous offender.**

In 1975, Petitioner was convicted of rape and aggravated burglary in Warren, Ohio. Petitioner was sent to the Ohio State Reformatory on April 30, 1976 for 25 years, but was paroled on September 2, 1977. Defense counsel Michael Sherwood successfully fought the prosecutor's attempt to have Petitioner labelled a "persistent offender" by asserting that the alleged victim of the 1975 rape had now recanted, and that a persistent felony offender status could be challenged on appeal if based upon that conviction. The Magistrate Judge notes that the 1975 conviction still stands. However, because the prosecutor did not want to develop the legal basis for the 1975 conviction at the time of sentencing and then defend a challenge to the use of the 1975 conviction on appeal, the prosecutor abandoned persistent felony offender status. (McLean Dep. at 10.)

The dangerous offender designation was not based upon the 1975 Ohio conviction, however, but on the nature of the crimes for which Petitioner was sentenced in Montana. (Sent. Tr. at 24–25.) Furthermore, the dangerous offender designation was a non-negotiable position the prosecution bargained for in the plea agreement negotiations. (Tr.Vol. I at 14, 64, 148; McLean Dep. at 10.) In light of all of these circumstances, the Magistrate Judge found that it was reasonable for defense counsel Michael Sherwood not to

challenge the dangerous offender designation on the basis of the 1975 Ohio conviction.

The applicable statute at the time of sentencing was § 46–18–404, Mont.Code Ann., which provides criteria for designating certain criminal defendants as non-dangerous offenders. A non-dangerous offender receives more favorable parole treatment than a dangerous offender. § 46–18–404 provided in part that:

The sentencing court shall designate an offender a non-dangerous offender for purposes of eligibility for parole ... if:

(a) during the 5 years preceding the commission of the offense for which the offender is being sentenced, the offender was neither convicted of nor incarcerated for an offense committed in this state or any other jurisdiction for which a sentence to a term of imprisonment in excess of one year could have been imposed; and

(b) the court has determined based on the presentence report and the evidence presented at the trial and the sentencing hearing that the offender does not represent a substantial danger to other persons or society.

Mont.Code Ann. § 46–18–404 (1979). Technically, because Petitioner was convicted and incarcerated in 1975 for felony rape and felony aggravated burglary, Petitioner could not satisfy the first requirement of the non-dangerous offender statute. Petitioner focuses on this part of the statute in bringing his first ineffective assistance of counsel claim.

 In analyzing this ineffective assistance of counsel claim, the court applies the two-part standard from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires a showing that (1) counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's error, the result of the proceeding would have been different. *Id.*, 466 U.S. at 687–88, 694, 104 S.Ct. at 2064, 2068. As to Petitioner's allegation that defense counsel Michael Sherwood rendered ineffective assistance because he did not argue against the dangerous offender designation on the basis of the faulty 1975 conviction, the second prong of the *Strickland* test resolves the inquiry.

Petitioner was charged with and pleaded guilty to two rapes and an aggravated assault, three offenses occurring in Missoula, Montana, during two weeks in the summer of 1980. Several weeks later, Petitioner was apprehended in another Montana city under suspicious circumstances indicating that he may have been planning to commit a similar offense. The presentence report does not describe the circumstances underlying Count I, which was dismissed as part of the plea agreement, but does describe the circumstances of the counts of conviction as follows:

*Count II. Sexual Intercourse Without Consent:*

On or about June 28, 1980, the Missoula City Police Department received a report of an alleged Sexual Intercourse Without Consent. The victim, [D.B.], stated that she had been awakened at about 5:00 A.M. by a man standing in the doorway to her bedroom. The man told her to keep her mouth shut, not to give him any trouble and she wouldn't get hurt. He then covered her head with a pillow case and began walking around the room and asked her if there was any money in the house. She told him there was $25.00 in the dresser, so he took the $25.00. He then returned to her bed, rolled her over on her back, stuck a knife to her back and told her if she cooperated she would not get hurt. He then inspected her body, noted that she was on her menstrual period and forced her to have oral sex with him. After he was through with the sexual attack he walked into the bathroom, opened several drawers and then left.

*Count III. Sexual Intercourse Without Consent:*

On or about July 9, 1980 Officer Al Baker of the Missoula City Police Department was dispatched to 510 S. 6th E. to investigate a report of a rape. The victim [A.H.], stated that she had returned home to her apartment at approximately 3:40 A.M. She began to get ready for bed when a man came out of a closet located at the foot of her bed. He was wearing a mask. He stated she had better cooperate or he would make trouble. He then had

her lay on the bed and cover her head with the bed covers. He then prowled around the apartment for approximately 15 minutes. During this time he took $20.00 to $30.00 from her wallet. He then laid down on the bed next to her. He told her to masturbate him and she resisted. He then placed what was believed to be a knife against her neck and told her to do it his way or he'd be a lot rougher. She then masturbated him against her will. He then had intercourse by kneeling behind her. After intercourse the suspect left the bed and, again, rummaged around the apartment. He then had [A.H.] take a shower and left while she was in the shower.

[A.H.] did give the officers a complete description of the suspect. Entry into the victim's house was made by pulling a bedroom window open and cutting a screen on the inside of the window. The screen was later located in the closet where the suspect had been hiding.

*Count IV. Aggravated Assault:*

On or about June 30, 1980 Missoula City Police Officers were contact by [W.A.] who stated she was the victim of a rape and robbery. She stated that she had been awakened at 4:00 A.M. by a man wearing a mask who was sticking a knife to her stomach and ordering her to cooperate or she would be hurt. The man stated he was going to rape her and she stated o.k. but she had venereal warts that appeared to turn him off. The man remained in her house for several hours during which time they talked. He asked her for money and she told him where $80.00 was and he took it. He then tied her hands in front of her and forced her to have oral sex at which after a couple of seconds she pretended to get sick so he got some Kleenex and made her masturbate him with her tied hands. At one time he was going to put butter on his penis so it would taste better but she refused so he said ok. The man left [W.A.'s] apartment at about 7:00 A.M. Entry into the house was made through a bathroom window.

\* \* \* \* \* \*

On July 24, 1980, the defendant, Kenneth Friedman, was apprehended by the Great Falls Police Department after running from a residence wearing a mask. Mr. Friedman matched the description and used the same modus aperandi [sic] of the suspect in the above stated cases. Detectives from the Missoula City Police Department traveled to Great Falls and interviewed the defendant. As a result of the interviews with Mr. Friedman the Missoula County Attorney's Office charged Mr. Friedman on September 17, 1980 with four counts of Sexual Intercourse Without Consent and three counts of Robbery.

\* \* \* \* \* \*

*Defendant's Version*

"It is not easy to explain just what could have led up to what I did. But I know I've got some kind of mental problem that is beyond what I could really explain or fully understand. I've had this problem for years, and after my experiences at Ohio State Reformatory, I think things within me got worse. Drugs didn't help matters either.

I had sexual relations with women without their consent, and I took money too. I would later deny to myself and others that these things happened. I never want to hurt anyone, and I try hard to understand why I did the things I did, but I need help . . . ."

(Presentence Report at 2–3, Docket # 163, App. 3.) Having read this presentence report, having heard the opinion of Dr. Stratford, a psychiatrist who testified at sentencing that Friedman was dangerous, and having received the recommendations of both the probation officer and the prosecutor that Friedman be designated a dangerous offender, Judge Harkin designated Petitioner a dangerous offender for parole purposes at the time of sentencing.

During the second evidentiary hearing, Judge Harkin acknowledged that he knew of Petitioner's previous record, but he also emphasized Petitioner's dangerousness:

This is a dangerous, dangerous man. And the more I deal with this, the more it starts to come back. Do not be fooled by

his size. This is a man that terrified many women, and I was not going to let him back out on the street unless I was assured that he no longer presented a danger to the people, and so—I'm a little off the track here, but I start getting involved here, and I hope you understand that. We had a goal here, which was to protect the public, number one; and second, to not have him stay in prison till he is an old man, but we had to assure ourselves that the public and women were safe from him, and that's what we kept driving at all the time.

(Tr.Vol. II at 44.)

Thus, even had defense counsel fought the dangerous offender designation by arguing that the court should not consider the 1975 Ohio conviction, the result would most assuredly have been the same. The prosecutor asked the court to designate Petitioner as a dangerous offender, as the prosecutor was entitled to do under the plea agreement, on the basis of the testimony of Dr. Stratford, a forensic psychiatrist, and on the basis of the very crimes to which Petitioner pleaded guilty. Dr. Stratford testified at the sentencing hearing that Petitioner was at that point in time a dangerous man. As the quoted passage of the presentence report shows, Petitioner's offenses did show him to be a substantial danger to other persons and society. Therefore, Petitioner could not satisfy the second requisite of § 46–18–404, and there is no reasonable probability that the result would be different had defense counsel argued against the dangerous offender designation by means of the affidavit in which the Ohio victim recanted her testimony.

A review of the sentencing transcript and the record as a whole shows that the 1975 Ohio conviction was not taken into account when the court designated Petitioner a dangerous offender. Furthermore, even if Petitioner's record before the sentencing judge were wiped clean of the 1975 Ohio conviction, this court is convinced that the sentencing judge would have designated Petitioner as a dangerous offender because of the nature of the crimes to which Petitioner pleaded guilty.

**Objection # 2: Defense counsel Michael Sherwood should have moved to suppress the lineup identifications and should have argued the suppression of the lineup identifications to buttress the motion to sever counts.**

■ At the lineup which took place on October 2, 1980, five men were shown one at a time to D.B. and W.A., two of the complaining witnesses, who remained in a separate room and viewed the participants through a window in a door. (Tr.Vol. II at 6–7.) There is conflicting testimony as to whether the complaining witnesses were in the room together, but both W.A. and D.B. denied that law enforcement directed their attention to any particular person in the lineup. (Tr.Vol. I at 81; Tr.Vol. II at 15.) W.A. testified at the evidentiary hearing that she had been both extremely tired and emotionally distressed at the time of the live lineup, to such an extent that she believes she should not have attempted the identification on that day. (Tr.Vol. I at 79–81.) W.A.'s testimony as to the procedures of the live lineup is therefore less credible than the testimony of D.B., who testified with more certainty as to the procedures of the lineup and as to her identification of the perpetrator.

Both D.B. and W.A. recalled having been in a hallway waiting area at the same time. (Tr.Vol. I at 74; Tr.Vol. II at 6.) W.A. recalled viewing the lineup while in the same room with D.B., but D.B. recalled not being in the same room with W.A. during the lineup. Instead, D.B. recalled only waiting in the hallway with W.A. prior to the lineup. (Tr.Vol. at 9.) D.B. identified Friedman as the perpetrator, but W.A. identified another individual as the perpetrator; even if the two victims were together during the lineup procedure, one identification did not contaminate the other identification. (Tr.Vol. I at 77.) D.B. recollected that she did not learn that W.A. had identified a different person until several days after the lineup. (Tr.Vol. II at 22–23; 26.) Approximately six weeks later, W.A. positively identified Friedman in a photo lineup. (Tr.Vol. II at 82–83.)

■ In determining whether or not to bring a motion to suppress the lineup identification, defense counsel Michael Sherwood discussed the propriety of the lineup proce-

dures with previous defense counsel, Mr. Riddiough, who was present at the lineup, and with Officer Foust. (Tr.Vol. I at 29.) Defense counsel determined that the lineup procedure was not improper. The court notes that "it is not professionally unreasonable to decide not to file a motion ... clearly lacking in merit." *United States v. Molina,* 934 F.2d 1440, 1447 (9th Cir.1991). Instead of filing a motion to suppress, defense counsel determined that by allowing both the positive and the negative identifications to come in at trial, he could argue that this was a case of misidentification and otherwise attack the identification process by using Allick's failure to identify Friedman in the lineup. (Tr.Vol. I at 29–30.) Defense counsel knew that an in-court identification was still possible even if he were able to successfully suppress D.B.'s identification of Friedman in the lineup. However, defense counsel had determined that he had no grounds for making a motion to suppress the live lineup identifications. (Tr.Vol. I at 59.)

In comparing defense counsel's performance to an objective standard of reasonableness, the court must extend to defense counsel the strong presumption that the challenged conduct might be considered sound trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Given that the victims could still make in-court identifications at trial, *see Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972), *see also United States v. Wade,* 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967), the decision to drop the suppression motion in favor of a misidentification defense is essentially one of strategy.

This court has considered whether it is reasonably probable—assuming Petitioner could have suppressed the two identifications and then obtained separate trials on all counts—that the result of the proceeding would have been the same. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Petitioner has not shown a reasonable probability that, but for counsel's alleged errors, he would not have pleaded guilty and would have insisted on going to trial. *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). This court finds that it is reasonably probable that Petitioner would

have entered into the same plea agreement even in the unlikely event he had obtained separate trials. As to Count II, D.B. made a strong, positive identification of Friedman in the lineup, and it is likely that she would have identified Friedman in court also. D.B. testified that the attack against her lasted 10 to 15 minutes, and that the perpetrator talked all the while. Although the perpetrator wore a mask, D.B. testified that his voice was "imprinted in [her] brain." (Tr.Vol. II at 24.) D.B. was "99.9 percent sure" that she had identified the perpetrator of the crime in the lineup. (Tr.Vol. II at 29.) During the rape, D.B. had studied the perpetrator's hands, looking for characteristics by which she could later identify the perpetrator. D.B. used her recollection of the perpetrator's hands to assist her in identifying the perpetrator at the lineup. (Tr.Vol. II at 8, 20–21.) Friedman had no alibi witness and was not himself a credible witness. (Tr.Vol. I at 33; 60.) Friedman had made admissions to law enforcement and to defense counsel. Thus, even if the lineup identification were suppressed and a separate trial ordered, there is a reasonable probability that the result would have been the same.

As to Count III, the sexual intercourse without consent charging relating to victim A.H., there was lab evidence supporting this charge, and A.H. was prepared to testify at trial. (Tr.Vol. II at 146.) Friedman had no alibi witness and was not himself a credible witness. (Tr.Vol. I at 33; 60.) In addition, it is likely that A.H. would have been allowed to make an in-court identification. Friedman had made admissions to law enforcement and to defense counsel. Again, even if a separate trial were ordered, there is a reasonable probability that the result would have been the same.

As to Count IV, the aggravated assault charge, W.A. was prepared to testify in court against Friedman and make an in-court identification based upon her knowledge of the perpetrator resulting from the three hours she was victimized by him. (Tr.Vol. I at 84.) Although W.A. did not identify Friedman in the first lineup, at a time when she was exhausted and emotionally distressed, she did identify Friedman as the perpetrator

during the photo lineup three weeks later. Friedman had no alibi witness and was not himself a credible witness. (Tr.Vol. I at 33; 60.) Friedman had made admissions to law enforcement and to defense counsel. Again, it is reasonably probable that, even if the photo lineup identification were suppressed and a separate trial ordered, the result would have been the same.

The court notes here that, altogether, Petitioner was facing three separate counts of sexual intercourse without consent, each carrying a maximum of twenty years imprisonment, one count of aggravated assault carrying a maximum of twenty years imprisonment, and three counts of robbery, each carrying a maximum of forty years imprisonment. If each term for each count were to have been imposed consecutively, the Petitioner's aggregate exposure by going to trial was 200 years' imprisonment. At age 24, such a lengthy sentence was a serious concern, both for Friedman and for defense counsel. Petitioner bargained for a plea agreement calling for a maximum term of imprisonment of 40 years, and that is what he received. Had Petitioner taken all four counts of rape/aggravated assault and all three counts of robbery to trial, even if he could get separate trials, his exposure would have been enormous. It is very likely that Petitioner would have entered into the same plea bargain, even if granted separate trials, because the probability of convictions would have remained strong. After reviewing the record of this case, this court is convinced that Petitioner's plea agreement represented a reasonable strategy for avoiding a potentially disastrous outcome, and Petitioner's ineffective assistance of counsel claim is without merit.

**Objection # 3: The plea agreement was breached when Judge Harkin exceeded the probation officer's recommended sentence.**

Prior to entry of plea, defense counsel and the prosecution met with District Court Judge Douglas Harkin to ask whether he would be willing to accept their plea agreement. (Tr.Vol. I at 13–14, 40–41.) In his personal notes, Judge Harkin wrote that he would not exceed the recommended sentence of the probation officer. (Petitioner's Exhibit B.)

■ The presentence report concludes with the probation officer's recommendation:

Taking all the facts of this case into consideration it is the opinion of this officer that the defendant does pose a definite threat to society and I would therefore recommend that Ken Friedman be sentenced to a term of not less than twenty years in Montana State Prison, I would further recommend that the court designate Mr. Friedman as a dangerous offender for purposes of parole.

(Presentence Report at 7, Docket # 163, App. 3.) Petitioner takes the position that either (1) the probation officer's recommendation was for a sentence of twenty years, or (2) the phrase "not less than twenty years in Montana State Prison" is ambiguous and under the rule of lenity should be interpreted in Petitioner's favor to mean a maximum sentence of twenty years.

■ Petitioner's position is without merit because there is nothing ambiguous about the probation officer's sentencing recommendation. The probation officer did not recommend a finite term (e.g., 20 years, 25 years, 30 years, or 40 years), but a minimum term of twenty years. The probation officer was not obligated to state a particular number of years as a recommended sentence, although he could have. Apparently Judge Harkin did not intend to exceed a term of imprisonment recommended by the probation officer, but as it happened the probation officer did not recommend a finite term of years. It is also worth noting here that any stated intention of Judge Harkin could not have been a part of the plea agreement presented to him for his approval because a sentencing judge is not a party to a plea agreement. In any case, Judge Harkin was free to impose a sentence in accord with the plea agreement, which allowed the prosecutor to recommend a sentence between 20 and 40 years. The prosecutor recommend that Petitioner be sentenced between 20 and 40 years, and Judge Harkin imposed 40 years imprisonment. A 40 year sentence does not exceed the recommended sentence of the probation officer.

Having thus subjected the evidence in this case and the Magistrate Judge's factual findings to a *de novo* review, this court finds that there is ample evidence to support the Magistrate Judge's conclusion that (1) Friedman entered a voluntary and knowing guilty plea; (2) Friedman received effective assistance of counsel; and (3) Friedman's plea bargain agreement was not breached.

## CONCLUSION

Having carefully reviewed the transcript of the evidentiary hearing and reviewed all other exhibits and materials on file herein, and having carefully considered Petitioner's objections, the court adopts the findings of the Magistrate Judge, and

**HEREBY ORDERS** that the Petition for Writ of Habeas Corpus be **DISMISSED** and all relief be denied.

The Clerk is directed forthwith to notify the parties and Magistrate Judge Holter of entry of this order.